GEORGE M. HOWARD et al., Appellants-Respondents, v WILLIAM E. MURRAY, Respondent-Appellant.

First Department, December 21, 1976

*Jerome R. Halperin* for appellants-respondents.

*Archibald A. Patterson* for respondent-appellant.

CAPOZZOLI, J. We affirm this judgment for the reasons set forth in the well considered and sound opinion of the trial court, arrived at after a lengthy trial during the course of which both parties had ample opportunity to present their proofs. We do not propose to add to that opinion as we are satisfied that it fairly represents the views of the majority. We shall, however, discuss some aspects of the views expressed in the dissent.

Amongst other things the dissent has failed to take note of the fact that almost a year elapsed from the time that the defendant, Murray, was brought into this matter by Mr. Webster, the personal lawyer of the plaintiffs. The plaintiff, Mr. Howard, a business man himself, had known Mr. Webster for eight or nine years, during which time this plaintiff had employed Mr. Webster as his lawyer on several occasions. The deal, which was finally agreed upon and which is the subject matter of this suit, was conceived and agreed upon by both lawyers, Webster and the defendant. At no time did the plaintiff Howard see the defendant without Webster being present and participating in the discussions. For almost a year this deal was peddled around to a number of persons by Howard and his lawyer Webster without success. No one bought it.

In fact the corporate tenant of the premises, H. L. Green & Co., had the right of first refusal under the lease. Howard and Webster offered the deal to the tenant and the latter declined it. In this connection it is interesting to note the reasons advanced by our dissenting colleague as to why the tenant turned down the offer. We emphatically disagree with those reasons as they find no support in the record and are based on

plain speculation. If the deal were as lucrative as is claimed by the plaintiffs would not this corporation, in the business of making money, have seen the advantages and seized the opportunity for itself? The trial court had a right to consider this fact amongst others in arriving at its determination. I think the conclusion is fair that the reason why the tenant turned it down is simply due to the fact that it did not see it as a sure thing as the plaintiffs now claim.

It should be emphasized that not every piece of real estate held by owners in 1959 have all increased in value. While it is true that many have increased, many others have been reduced in value. Looking back to the year 1959 by way of hindsight, we might agree that this piece of property may have increased in value although no proof was offered on this point. It should also be recalled that the fire which destroyed the old building in 1961 and which could not have been foreseen, brought about the erection of the present building with the money received from the fire insurance company. This improved the value of the premises. While on the subject it is interesting to note that the plaintiff, for some time, failed to inform the defendant of the increase in the rental which followed the secret side agreement for increased rentals based on sales of the tenant. In fact, the plaintiffs kept the defendant in the dark about this matter, which detracts from their claimed reliance upon the conduct of defendant.

The primary fact which stands out in an examination of the record is the obvious disbelief by the trial court of the testimony of the plaintiff Howard. At one time in the course of his testimony the plaintiff went so far as to accuse his own lawyer, Webster, deceased at time of trial, of entering into a conspiracy with the defendant to defraud him.

At pages 276-277 of the trial minutes we find the following questions posed by the court and the answers thereto given by the plaintiff Howard.

"Q Now, you knew Mr. Webster for a number of years, I take it?

A Eight or nine.

Q Beg pardon? A Eight or nine.

Q And you considered him a competent attorney?

A For the legal advice that I acquired, yes.

Q In your dealings with him did you find him to be honest and upright?

A Yes.

Q As you now reflect on the matter, do you believe that Mr. Webster was involved in any swindle of you? A I hate to say it, your Honor, but truthfully I do".

As against this charge by the plaintiff directed at his personal lawyer, let us consider the statement thereafter made by his trial counsel as it appears at page 330 of the trial minutes: "I thought Mr. Webster was a very fine man frankly, I liked him very much and I thought he did his work as best he saw it; and there were never any overtones in my mind or indication in my mind that perhaps there was any connivance. I am speaking of my own belief, of knowing Mr. Webster."

Another interesting exchange between the court and the plaintiff Howard is to be found starting at page 282 of the trial minutes in an examination by the court:

"Q You told us that at the time Mr. Murray's proposition was being discussed by you and Mr. Webster and Mr. Murray, that one of the considerations that appealed to you was the fact that the income you would receive was to be tax free? A That's correct.

Q Now, did you ask him how this was to be done? A They advised me that it was tax-wise feasible.

Q I know, but did you probe on what theory it would be tax free? A No, I did not. I depended upon their advice entirely and more particularly on the advice of Mr. Murray than Mr. Webster.

Q You have been in business for a number of years? A Yes, sir.

Q In the plumbing business? A I was.

Q Novelty business? A Correct.

Q Having operated this building which you had inherited from your family, you were quite familiar with the vagaries of tax laws, weren't you? A No, I was not although I knew they existed.

Q You had been paying them all these years, hadn't you? A Actual taxes, yes.

Q And now you were working out something whereby you were going to get tax free income?

A That's correct.

Q Now you want me to understand that you did not ask either Mr. Webster or Mr. Murray the theory on which this

tax free income was going to flow, not only to you but to your wife at your death?

A No, I did not ask that question, your Honor, I believed what they told me to be true, that they worked out a tax plan themselves and it was feasible."

At another point in the record, again when being questioned by the court, the plaintiff Howard conceded that the final decision made by him to accept the deal was his own independent judgment after the defendant had agreed to pay more money. At page 202 of the trial minutes we find the following questions by the court and the answers of the plaintiff:

"THE COURT: Now, after he added those items to the table, so to speak, you made a judgment as to whether or not the items were of any value or whether they were of the value that was being placed upon them, didn't you?

THE WITNESS: I certainly did. I believed they were, otherwise I would not have accepted his agreement.

THE COURT: So that that was an independent judgment of your own, is that correct?

THE WITNESS: Correct.

THE COURT: You were not relying then upon anything he said to you, you made an independent evaluation of what was being put on the table, is that correct?

THE WITNESS: That's correct.

THE COURT: And you were also being assisted by Mr. Webster at that point?

THE WITNESS: I was not even allowed to talk to Mr. Webster at that meeting. Mr. Murray was really quite upset.

THE COURT: What do you mean that you were not allowed to talk to him? What did he do, muscle you?

THE WITNESS: Not quite, your Honor.

THE COURT: He did not hold a gun on you or anything, did he?

THE WITNESS: No, no, he became so incensed that it was an unpleasant situation, let me explain it that way."

The issue is not whether the plaintiff made a good or a bad bargain. It was the duty of the trial court to evaluate all the evidence before it in light of the established rule of law as settled in *Whitehead v Kennedy* (69 NY 462). It is clear that the trial court did do so and after having evaluated the total evidence with this rule in mind, nevertheless found that the

defendant sustained his burden of proving the fairness of the transaction and that he was not guilty of any impropriety toward the plaintiff. As the Court of Appeals said when it considered this very case (38 NY2d 695, 699): "Nevertheless we cannot say that the agreement is unfair as a matter of law."

It is indeed a question of fact which is presented by this record and we are satisfied that the determination of the court below should not be disturbed.

We therefore affirm on the law and the facts, without costs.

SILVERMAN, J. (dissenting). I would reverse the judgment of the Supreme Court and grant judgment for the plaintiffs.

The action is essentially one to rescind a mortgage, bond, and related agreements entered into in 1959 and a subsequent 1964 agreement between plaintiffs and the defendant, the latter an attorney. The Supreme Court, this court, and the Court of Appeals are all in agreement that during these transactions plaintiffs and defendant stood in an attorney-client relationship.

The Supreme Court, after trial, granted judgment for defendant. On appeal, this court affirmed the judgment on the ground that plaintiffs' claim was barred by the statute of limitations; this court did not reach the question of the merits. Presiding Justice McGIVERN dissented and said: "In view of the attorney-client relationship, which pervaded the trial and which is at the heart of the appeal before us, I believe the trial court erred in upholding the fairness of the transaction". (Howard v Murray, 46 AD2d 880, 881.) The Court of Appeals disagreed with this court's holding that the plaintiffs' claim was barred by the Statute of Limitations and sent the case back to this court for a review of the facts. (Howard v Murray, 38 NY2d 695.)

The Court of Appeals said (supra, p 699): "The crucial question is whether the defendant attorney established that the contract 'was made by the client with full knowledge of all material circumstances known to the attorney, and was in every respect free from fraud * * * and that a reasonable use was made by the attorney of the confidence reposed in him' (Whitehead v Kennedy, 69 NY 462, 466). The trial court held that he did, and that factual determination is beyond review in this court since the findings of fact have not been thus far

overturned by the Appellate Division." It is for determination of this issue that the case has been remitted to this court.

The underlying facts are stated in considerable detail in the opinion of the Court of Appeals and I shall not repeat them here. The end result of the agreement between the parties was as the Court of Appeals said *(supra,* pp 698-699): "Basically the defendant acquired the right to purchase the property at an amount considerably below its actual value."

In essence, by this rather complicated set of agreements, defendant attorney obtained an option to buy plaintiffs' interest as fee owner, then worth approximately $220,000 (now apparently worth much more), for payments which might be as little as $12,000 or as much as $72,000, plus a problematical additional amount if plaintiff wife survived her husband and the income from the property was less than $9,000 per annum above mortgage carrying charges. If plaintiff husband were to die in the first year after the contract, defendant would acquire the property for only the $12,000 payable in the first year plus the problematical annuity to the wife. If, at any time in the future the deal looked less promising, defendant could stop the payments at less than $72,000 and he would still have the mortgage to secure the amounts advanced (interest-free to be sure up to the date of plaintiff husband's death). As the Court of Appeals said, "It is true, of course, that the property might have decreased in value, but the defendant had insured against this by reserving the right to cease making further payments on the loan. In view of this it would certainly appear that the defendant got the better of the bargain." (38 NY2d 695, 699, *supra.)*

The Trial Justice thought that the fairness of the proposal was demonstrated by the fact that the same proposal was offered to the tenant McCrory Corporation, a department store, and the tenant turned it down. The offer was made to McCrory Corporation under the right of first refusal that the tenant had under the lease. As a practical matter one could hardly expect a department store to be interested in so gadgety a deal as here proposed, including a guarantee against theoretical capital gains and estate taxes. Such a deal would be more understandable to a tax lawyer, which defendant was. Furthermore, in the case of this particular tenant, purchase was most unlikely as defendant well knew, having been told it by plaintiffs' regular attorney, "as you know, the H. L. Green Company has had its problems and at least for

the moment it would seem that there is no possibility of selling the building to them at any figure."

"[A]n attorney who seeks to avail himself of a contract made with his client, is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on his part, or misconception on the part of the client, and that a reasonable use was made by the attorney of the confidence reposed in him." *(Whitehead v Kennedy,* 69 NY 462, 466.) I think that in such cases the rule generally applicable to transactions between fiduciaries and beneficiaries should apply. "If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance." *(Wendt v Fischer,* 243 NY 439, 443.)

The transaction was a complicated tax gimmick. A layman could easily be confused as to its implications and ramifications. To sustain such a contract, the lawyer should be called upon to show that he had stated to his client the possible unfavorable contingencies in the bluntest terms as well as telling him flatly, "I am not your attorney in this matter; don't rely upon me; get outside advice." Such statements should not be left to implication. The attorney should bluntly have told the client that if he died within a year his lawyer would be able to acquire the property for $12,000. He should have pointed out bluntly the other aspects which could make the bargain a good one for the lawyer and a bad one for his client so as to make sure that the client had "full knowledge of all the material circumstances known to the attorney." *(Whitehead v Kennedy, supra,* p 466.) The lawyer should prove that he made to his client a statement similar to the one that the lawyer made to his real estate broker friend Reynolds earlier: "As it appears that Mrs. Howard's life expectancy is only fourteen years, it does not appear that the annuity to her has any substantial value since she would probably be deceased prior to the eighteen year period. The value of an annuity of $4,000 per year for the term of life of a man aged 54 is roughly $53,600. As the value of this property is somewhere between $460,000 and $500,000, subject to a mortgage of $280,000, it appears that property worth $180,000 to $220,000 can be acquired by the payment of $53,600." The transaction was later modified so as to include the $12,000 down payment and to increase the guarantee of plaintiff wife's

annuity from $8,000 to $9,000, but the disparity would still be startling.

MARKEWICH, J. P., and NUNEZ, J., concur with CAPOZZOLI, J.; SILVERMAN, J., dissents in an opinion.

Upon remand from the Court of Appeals, judgment of the Supreme Court, New York County, entered on June 13, 1974, affirmed on the law and the facts, without costs and without disbursements.